1

2

3

4               UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7   21ST MORTGAGE CORPORATION,          Case No. 3:23-cv-04514-JSC

8                 Appellant

9          v.                           **ORDER RE: BANKRUPTY APPEAL**

10  THE HAYES,

11                Appellees

12

13         21st Mortgage Corporation ("21st Mortgage") appeals a bankruptcy court's Order Setting

14  Standard for Valuation. (Dkt. No. 12-1 at 228-230.)[1]  The Valuation found 21st Mortgage's

15  interest in the debtors' mobilehome[2] was limited to the mobilehome's "box value," rather than its

16  "in-place value," which would include "any value attributable to the manufactured home's

17  location" in the Mountain Shadows Community Park in San Jose, California.  (Dkt. No. 1.)

18  Having carefully considered the briefing, and with the benefit of oral argument on May 2, 2024,

19  the Court AFFIRMS the bankruptcy court's order.  According to the agreement between 21st

20  Mortgage and the Hayes, 21st Mortgage had a "security interest in: The Manufactured Home,

21  which will be located at 631 Shadow Creek Dr, San Jose, CA 95136."  (Dkt. No. 12-1 at 162.)

22

23  [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
    ECF-generated page numbers at the top of the documents.

24  [2] 21st Mortgage refers to the unit as a "manufactured home," and the park as "the Mountain
    Shadows Manufactured Home Community Park."  The Hayes assert the unit "is not a

25  manufactured home," because California law defines a "mobilehome" as a "structure designed for
    human habitation and for being moved on a street or highway," and explains the term

26  "[m]obilehome includes a manufactured home, as defined in Section 18007 of the Health and
    Safety Code."  Cal. Civ. Code § 798.3(a).  A "[m]anufactured home" is then defined as "a

27  structure that was constructed on or after June 15, 1976," among other size and manufacturing
    requirements.  Cal. Health & Safety Code § 18007(a).  The Hayes' unit was constructed in 1973.

28  (Dkt. No. 12-1 at 161.)  So, for the purposes of this Order, the Court will refer to the unit as a
    "mobilehome," though nothing about the Court's analysis turns on this terminology distinction.

The agreement did not provide 21st Mortgage with a security interest in the mobilehome's *location*. Because 21st Mortgage's security interest was in the mobilehome exclusively, its interest in the mobilehome is limited to the replacement value of the physical mobilehome, or the "box value" of the mobilehome.

## BACKGROUND

In December of 2019, Michael Jonathan Hayes and Sharon Elizabeth Hayes borrowed approximately $177,566.25 from 21st Mortgage to purchase a 1973 Fleetwood used mobilehome. (Dkt. No. 12-1 at 161-64.) The Hayes gave 21st Mortgage "security interest in: The Manufactured Home, which will be located at 631 Shadow Creek Dr, San Jose, CA 95136," a location inside the Mountain Shadows Community Park. (*Id.* 162.) The "Security Interest" is then described as:

> SECURITY INTEREST: To secure payment of all sums due or which become due under this Note, and Borrower's performance of all other terms of the Note, Borrower grants Lender a first priority security interest in (1) the Manufactured Home, and all accessions, attachments, accessories, replacements and additions to the Manufactured Home, whether added now or later; (2) the "Property" described in any mortgage or deed of trust Borrower gives to Lender; (3) Borrower's rights to refunds of premiums for and payments under, and proceeds of any insurance or any extended warranty or service contract purchased with the proceeds of this Note; (4) any amounts held in escrow by Lender for Borrower; and, (5) proceeds and products of all of the foregoing (collectively, the "Collateral"). . . If Lender is taking a security interest in real property, such interest is reflected in a mortgage or deed of trust signed in conjunction with this Note.

(*Id.*) No "mortgage or deed of trust" appears in the record. Further, the parties agree the Hayes "have no ownership interest" in the lot they are renting inside the park (*Id.* at 113; Dkt. No. 12 at 12), and neither party asserts 21st Mortgage has a security interest in any real property related to the Hayes' estate—the agreement itself indicates "the Manufactured Home is, and shall remain, during the term of this Note, personal property." (*Id.*)

The contract between the Hayes and 21st Mortgage has terms and conditions, including: "Borrower may not move the Manufactured Home without Lender's prior written consent." (*Id.* at 167.) Moreover, "[i]f Borrower fails to pay park or lot rent (and any other related charges). . . Lender may (but is not required to) make such . . . payments as Lender chooses." (*Id.* at 166.)

At the time of the Hayes' purchase of the home, the "estimated market value" for the

2

United States District Court
Northern District of California

1   mobilehome was $215,900 considering "[t]he best recent available sales from Mountain Shadows

2   Comm[unity]." (*Id.* at 172.)

3          In November 2022, the Hayes filed for Chapter 13 bankruptcy. (*Id.* at 22-79.) The Hayes

4   listed the "value of creditor's interest in its collateral" as $24,200. (*Id.* at 93.) They indicated they

5   pay $743 per month to lease the "ground or lot" of the home in the park. (*Id.* at 64.)

6          21st Mortgage objected to the Hayes's Chapter 13 plan and to the valuation of the

7   mobilehome, asserting "any valuation of the Property must necessarily include a valuation of the

8   Manufactured Home, as a residence in the Park not as a 'box' sitting in a driveway or sales lot."

9   (*Id.* at 101, 111.) The Hayes moved the bankruptcy court to determine the appropriate method of

10  valuation of their mobilehome, asserting the proper valuation for the mobile home was "the

11  replacement value of the mobile home itself, without regard to its location in a mobile home park."

12  (*Id.* at 113.)

13         The bankruptcy court held 21st Mortgage's "interest in the Manufactured Home is limited

14  to the replacement value of its collateral," and therefore the "box value" was the appropriate

15  valuation since "the creditor does not hold a security interest in the surrounding real property."

16  (*Id.* at 230.) Pending before the Court is 21st Mortgage's appeal of that order.

17                                  **JURISDICTION**

18         District courts have jurisdiction over "final judgments, orders, and decrees" as well as

19  "with leave of the court, from other interlocutory orders and decrees[] of bankruptcy judges"

20  under 28 U.S.C. § 158(a). "Congress has long provided that orders in bankruptcy cases may be

21  immediately appealed if they finally dispose of discrete disputes within the larger case." *Bullard*

22  *v. Blue Hills Bank*, 575 U.S. 496, 501 (2015) (quoting *Howard Delivery Service, Inc. v. Zurich*

23  *American Ins. Co.*, 547 U.S. 651, 657, n.3 (2006)). As both parties, and the Court, agree the

24  resolution of this issue will "finally dispose of [a] discrete dispute[] within the larger case," the

25  Court accepts the appeal.

26         "[T]he district court functions as an appellate court in reviewing a bankruptcy decision and

27  applies the same standards of review as a federal court of appeals." *In re Crystal Properties, Ltd.,*

28  *L.P.*, 268 F.3d 743, 755 (9th Cir. 2001). Because this is a purely legal question, review is de novo.

1    *In re Mortgages Ltd.*, 771 F.3d 1211, 1214 (9th Cir. 2014).

2                                   **LEGAL STANDARDS**

3           "To qualify for confirmation under Chapter 13, the" Hayes' "plan had to satisfy the

4    requirements set forth in § 1325(a) of the Code." *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 956

5    (1997).  "Under this provision, a plan's proposed treatment of secured claims can be confirmed if

6    one of three conditions is satisfied," (1) "[t]he secured creditor accepts the plan;" (2) "the debtor

7    surrenders the property securing the claim to the creditor;" or (3) "the debtor invokes the so-called

8    'cram down' power." *Id.* at 956-57 (citing see 11 U.S.C. § 1325(a)(5)(A), (C), and (B)

9    respectively).  "Under the cram down option, the debtor is permitted to keep the property over the

10   objection of the creditor," though "the creditor retains the lien securing the claim." *Id.* at 957

11   (citing 11 U.S.C. § 1325(a)(5)(B)(i)).  Moreover, "the debtor is required to provide the creditor

12   with payments, over the life of the plan, that will total the present value of the allowed secured

13   claim, *i.e.*, the present value of the collateral." *Id.* (citing § 1325(a)(5)(B)(ii)).  Finally, "the value

14   of the allowed secured claim is governed by § 506(a) of the Code." *Id.*

15          Section 506(a) provides:

16              (1) An allowed claim of a creditor secured by a lien on property in
                which the estate has an interest, . . . is a secured claim to the extent of
17              the value of such creditor's interest in the estate's interest in such
                property, . . . and is an unsecured claim to the extent that the value of
18              such creditor's interest . . . is less than the amount of such allowed
                claim.  Such value shall be determined in light of the purpose of the
19              valuation and of the proposed disposition or use of such property.
                 . . .
20
                (2) If the debtor is an individual in a case under chapter. . . 13, such
21              value with respect to personal property securing an allowed claim
                shall be determined based on the replacement value of such property
22              as of the date of the filing of the petition without deduction for costs
                of sale or marketing.  With respect to property acquired for personal,
23              family, or household purposes, replacement value shall mean the
                price a retail merchant would charge for property of that kind
24              considering the age and condition of the property at the time value is
                determined.
25

26   11 U.S.C. § 506(a).

27                                      **DISCUSSION**

28          Section 506(a)(1) requires the Court (1) determine what the creditor's secured interest is,

United States District Court
Northern District of California

1    and then (2) determine the value of that secured interest "in light of the purpose of the . . .

2    proposed disposition or use of such property." 11 U.S.C. § 506(a)(1).  Moreover, because the

3    mobilehome is "personal property," § 506(a)(2) instructs the value of the secured interest is the

4    "replacement value of such property," or "the price a retail merchant would charge for property of

5    that kind considering the age and condition of the property."  11 U.S.C. § 506(a)(2).

6        **A.**      **What is 21st Mortgage's secured interest?**

7      "The § 506(a) phrase referring to the 'creditor's interest in the estate's interest in such

8    property' [] recognizes that a court may encounter, and in such instances must evaluate, limited or

9    partial interests in collateral." *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 961 (1997).  So, "[t]he

10   first sentence, in its entirety, tells us that a secured creditor's claim is to be divided into secured

11   and unsecured portions, with the secured portion of the claim limited to the value of the

12   collateral." *Id.*

13       The parties agree "21st Mortgage only has a security interest in the Manufactured Home

14   and that neither Debtors nor 21st Mortgage have any ownership interest in the underling real

15   property." (Dkt. Nos. 18 at 23; 21 at 7.)  This appeal turns on whether 21st Mortgage's security

16   interest includes the additional value attributable to the location of the home, or whether it only

17   extends to the physical mobilehome itself.  The Hayes contend 21st Mortgage's interest extends

18   only to the value of the physicial mobilehome itself and so the mobilehome's value is $24,200.

19   21st Mortgage argues its secured interest extends to the value of the mobilehome in light of its

20   location in a particular mobilehome park and the statutory protections afforded mobilehome park

21   lessees, and asserts the value is "no less than $180,000 to $270,000."  (Dkt. No. 12-1 at 103.)

22       California's Mobilehome Residency Law "limits the bases upon which a park owner may

23   terminate a mobile home owner's tenancy." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 524

24   (1992) (citing Cal. Civ. Code § 798.56).  Moreover, "[w]hile a rental agreement is in effect. . . the

25   park owner generally may not require the removal of a mobile home when it is sold," "charge a

26   transfer fee for the sale," or "disapprove of the purchaser, provided that the purchaser has the

27   ability to pay the rent." *Id.* (citing Cal. Civ. Code §§ 798.72-74).  Many cities, including San Jose,

28   have rent control ordinances that further protect mobilehome owners.  *See* San Jose Municipal

United States District Court
Northern District of California

Code ch. 17.22; *see also Manufactured Home Communities Inc. v. City of San Jose*, 420 F.3d 1022, 1026 (9th Cir. 2005) (describing San Jose's Mobilehome Rent Ordinance). Combined, these statutory provisions increase the value of individual leases in mobilehome parks located in desired locations, such as San Jose. Because the right to a lease often transfers with the sale of the physical mobilehome, mobilehomes in such parks sell for higher rates than the cost of the physical components of the mobilehome. *See MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1122 (9th Cir. 2013) ("Mobilehome owners sell their mobilehome and pad lease rights for one lump sum, so value of the rent controls is figured into the total purchase price and 'capitalized' into the value of the mobilehome.").

### 1.   The loan agreement limits the secured interest to the mobilehome alone.

State law determines the extent of 21st Mortgage's security interest. *See Butner v. United States*, 440 U.S. 48, 54-55 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law," and therefore "state law" defines the "security interests" of the creditor); *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 965 n.6 (1997)(explaining the valuation should not include modifications to a property if "creditor's lien would not extend under state law" to those modifications). In California, "a security interest is enforceable against the debtor . . . with respect to the collateral only if . . . [t]he debtor has signed a security agreement that provides a description of the collateral." Cal. Com. Code § 9203(b). Further, "a description of personal or real property is sufficient. . . if it reasonably identifies what is described." Cal. Com. Code § 9108(a). According to the parties' agreement, 21st Mortgage's security interest is in "The Manufactured Home, which will be located at 631 Shadow Creek Dr, San Jose, CA 95136." (Dkt. No. 12-1 at 162.) The collateral is further described as the mobilehome and its "attachments, accessories, replacements and additions, . . . whether added now or later," as well insurance proceeds and extended warranties. Based on this description, 21st Mortgage does not have a security interest in the Hayes' lease with the park, any value attributed to that lease, or the mobilehome's location. As a result, 21st Mortgage's security interest is limited to the value of the mobilehome *itself* without consideration of any value of the Hayes' rights to the

lease.  *See In re Young*, 367 B.R. 183, 188-91 (Bankr. N.D. Cal. 2007) (holding the lender's "interest" in the "mobile home is defined by the Agreement" between the parties, and "[a]ccording to the Agreement, Creditor's security interest extends only to the mobile home itself," so "[t]he calculation of the replacement value does not include the mobile home's in-place value," because the "Creditor is not secured to any extent by Debtors' leasehold interest in the mobile home space" and the debtors make "separate payments to the park landlord" which "presumably reflect the full value of the location").

21st Mortgage does not dispute that the loan agreement describes the secured interest as the mobilehome and not also the leasehold interest or any other real property interest.  But, it insists "[t]he bankruptcy court erred by holding that 21st Mortgage must have an interest in the Debtors' lease or the Park's real property in order to include the 'in place' value as a collateral for a loan." (Dkt. No. 12 at 25.)  They assert "the 'in-place' value of the Manufactured Home exists apart from the lease or real property," and instead "[i]t is the home itself that retains the 'in-place' value," because "each sale of a manufactured home transfers this total value in a single, inseparable transaction."  (*Id.* at 26-27.)   According to 21st Mortgage, this value is "inextricably bound to the manufactured home."  (Dkt. No. 21 at 12.)

The Court disagrees.  Contrary to 21st Mortgage's argument, the right to lease in the park is separable from the mobilehome itself—for example, if the Hayes' mobilehome burned down, the value of the land, and therefore the value of the right to lease that land, would remain even though the value of the physical box of the mobilehome would be significantly diminished.  Similarly, if the Hayes moved the mobilehome to another location, the mobilehome would lose any value attributed to its location.

21st Mortgage's analogy to a "vehicle warranty that stays with the vehicle, and therefore must be considered as part of the vehicle's replacement value," citing *In re Flores*, 363 B.R. 799 (Bankr. N.D. Tex. 2007) (Dkt. No. 12 at 28), is unpersuasive.  In *In re Flores*, a bankruptcy court held the "replacement value" of a car included "an extended warranty having identical terms to those now in place pursuant to the Warranty" because "the Warranty is an attribute of the Vehicle" and the "Warranty cannot be transferred separately from the Vehicle."  *Id.* at 800-801; *see also id.*

United States District Court
Northern District of California

at 800 n.4. (noting that "the Warranty is completely pre-paid and bound to the vehicle").  Unlike a warranty tied to the mobilehome, the value attributed to the current location of the mobilehome due to the lease rights can be transferred separately from the mobilehome and *does* have value independent of the specific mobilehome.

Further, just because a mobilehome owner *usually* transfers the entirety of the leasehold value along with the sale of the physical mobilehome, *see* Cal. Civ. Code § 798.74(c) (indicating "management" of a mobilehome park "shall not withhold approval from a prospective purchase of a mobilehome unless" the prospective purchaser cannot afford rent, has a fraudulent application, or will not follow the park's rules), does not mean the leasehold value is *inseparable* from the physical mobilehome itself.  Consider the following scenario: a mobilehome owner purchases a new box mobilehome, moves the new mobilehome onto the pad she currently occupies inside a mobilehome park, and moves her existing mobilehome elsewhere.  The older "box" mobilehome would not retain the right to the leasehold once it is moved elsewhere.  Instead, that right belongs to the individual residents.

So, 21st Mortgage has not established it acquired a secured interest in the in-place value of the mobilehome through its secured interest in the physical mobile home, as the two values are distinct.

### 2.    Statutory rights do not expand 21st Mortgage's § 506(a)(1)) interest to include the value of the rent-controlled lease.

In an amicus brief, the California Manufactured Housing Institute—a "non-profit public benefit professional and trade association serving manufactured home manufacturers, retailers, lenders, developers, manufactured home community owners, along with their supplier companies" (Dkt. No. 15 at 6)—argues "manufactured home lenders in California are granted significant statutory interests based on the location of their collateral" and these "statutory interests supplement their contractual lien rights in the home itself."  (*Id.* at 24.)  Therefore, "the 'creditor's interest' in the estate's interest in the manufactured home (per § 506(a)(1)) is not limited to its 'security interest'; it includes the creditor's statutory rights to the home in place."  (*Id.* at 26.)

California does provide significant rights to the "legal owners" of mobilehomes.  21st

Mortgage is the "legal owner" of the mobilehome at issue.  (Dkt. No. 12-1 at 171 (Certificate of Title of the Mobilehome indicating "Michael Jonathan Hayes and Sharon Elizabeth Hayes are the "Registered owners" and "21st Mortgage Corporation" is the "Legal Owner."); *see also* Cal. Health & Safety Code § 18005.8 (defining "[l]egal owner" as "a person holding a security interest in a manufactured home," or "mobilehome, . . . perfected by filing the appropriate documents with the department pursuant to Section 18080.7").  California Health and Safety Code § 18099.5(a) provides: "no person shall move, permit to be moved, or cause to be moved, any manufactured home, mobilehome, or floating home from the situs indicated on the registration card, without first obtaining the written consent of the legal owner."  Cal. Health & Safety Code § 18099.5(a). Further, if the legal owner "forecloses on his or her security interest in a mobilehome located in a mobilehome park," the legal owner has "the right to sell the mobilehome within the park to a third party."  Cal. Civ. Code § 798.79 (a); *see also* Cal. Civ. Code § 798.56a(b) ("A legal owner. . . may sell the mobilehome within the park to a third party and keep the mobilehome on the site within the mobilehome park until it is resold" if certain requirements are met).

However, none of these statutory rights expand 21st Mortgage's enumerated security interest to include an interest in anything other than the physical mobilehome.  To put it another way, these statutes do not modify the law requiring a secured agreement to describe the collateral, nor do they state that the secured interest in a mobilehome includes the value attributable to the location or leasehold, even if the agreement does not describe the collateral as including the leasehold interest or any other value attributable to the mobilehome's current location.

Moreover, while 21st Mortgage would be able to benefit from these statutory rights in the event of a foreclosure, that legal right does not impact the analysis.  In *In re Sunnyslope Housing Ltd. Partnership*,[3] the Ninth Circuit "confront[ed] the atypical case" in which the foreclosure value was higher than the replacement value "[b]ecause foreclosure would vitiate covenants requiring that the secured property—an apartment complex—be used for low-income housing."  859 F.3d

---

[3] The California Manufactured Housing Institute asserts *Sunnyslope* "deals with the valuation of real property only under § 506(a)(1)," so it "is of little probative value in this case."  (Dkt. No. 15 at 17 n.8.)  While *Sunnyslope* does address the valuation of real property, the Court finds its explanation of § 506(a)(1) helpful.

637, 640 (9th Cir. 2017), *as amended* (June 23, 2017).  Construction for Sunnyslope, the apartment complex at issue, was paid for by various loans, some of which came with an agreement that provided a covenant that ran with the land.  *Id.* at 641.  The restrictive covenant required a certain percentage of the units in the apartment complex to be low-incoming housing.  *Id.*  But, foreclosure terminated the restrictive covenant—meaning a foreclosure would increase the property's value.  *Id.*  In bankruptcy proceedings, Sunnyslope sought to retain the complex and exercised the "cram-down" provision, asserting "the property should be valued as low-income housing."  *Id.* at 641-42.  Sunnyslope's creditors objected and argued the complex should be valued at its foreclosure price, that is, the price it would sell at without the restrictive covenant requiring low-income housing.  *Id.* at 641-642.

The court "t[ook] the Supreme Court at its word and h[e]ld, as *Rash* teaches, that § 506(a)(1) requires the use of replacement value rather than a hypothetical value derived from the very foreclosure that the reorganization is designed to avoid."  *Id.*  It explained "[t]he essential inquiry under *Rash* is to determine the price that a debtor in Sunnyslope's position would pay to obtain an asset like the collateral for the particular use proposed in the plan of reorganization."  *Id.* at 644 (citing *Rash*, 520 U.S. at 965).  Further, the court explained the creditor "bought the Sunnyslope loan at a substantial discount, knowing of the risk that the property would remain subject to the low-income housing requirements," so valuing the "collateral with those restrictions in mind subjects the lender to no more risk than it consciously undertook."  *Id.* at 645.  Therefore, the "restrictions" from the covenants that "continue to run with the land absent foreclosure . . were properly considered in determining the value of the collateral."  *Id.*

Similarly, in this case, the Court must "determine the price that a debtor in [the Hayes's] position would pay to obtain an asset like the collateral."  Here, the "collateral" is the physical mobilehome.  While the physical mobilehome would be worth more to 21st Mortgage in the event of a foreclosure—as 21st Mortgage would then be entitled to the additional value stemming from the right to the leasehold in the park which could transfer with the sale of the mobilehome to a third party—the Court is not tasked with determining the value of a foreclosure to 21st Mortgage.

At oral argument, 21st Mortgage asserted *In re Sunnyslope* supports its position because

1   that court evaluated the value of the apartment complex considering the restrictive covenants that

2   lowered its value; accordingly, 21st Mortgage argues the mobilehome should be valued

3   considering the location which increases its value.  But the restrictive covenants in *In re*

4   *Sunnyslope* truly were inseparable from the real property in question—they were attached to that

5   property and had no value independent from that property.  In contrast, as discussed above, the

6   right to the leasehold *does* have value independent of the physical structure of the mobilehome.

7   21st Mortgage also cites *In re Valdez*, when a bankruptcy court held, under California law:

> [U]nless Debtors pay the note in full, [the creditor] has a statutory
> right to sell Debtors' mobilehome at its current location within the
> mobilehome park and to keep all proceeds from that sale. Because
> this right arises by statute, it does not depend upon [the creditor]
> having a perfected security interest in any leasehold. Because [the
> creditor's] rights in the collateral under state law include its value in
> place in the mobilehome park, I determine that the value of the
> collateral for the purpose of fixing the amount of [the creditor's]
> secured claim under 11 U.S.C. § 506 is the property's in-place value.

13  338 B.R. 97, 99 (Bankr. N.D. Cal. 2006).  *In re Valdez*, which was decided before *Sunnyslope*,

14  assumes the question of the creditor's security interest is irrelevant, instead concluding the

15  creditor's right in the collateral can be determined by what the creditor would be entitled to in the

16  event of a foreclosure.  But *Sunnyslope* explained a creditor's collateral is not necessarily

17  equivalent to the amount the creditor could obtain at a foreclosure.

18  Finally, 21st Mortgage contends 11 U.S.C. § 506(a)(2)'s instruction regarding the

19  "replacement value" of personal property as "the price a retail merchant would charge for property

20  *of that kind*" means the court should assess a mobilehome with the same features and location as

21  the Hayes' home, so the best valuation guide would be the appraisal value of the mobilehome

22  itself.  11 U.S.C. § 506(a)(2) (emphasis added).  In doing so, 21st Mortgage focuses on the

23  language instructing a valuation for property "of that kind," arguing "of that kind" includes

24  location.  But this argument ignores the § 506(a)(2) provision instructing the "replacement value"

25  is the "price a retail merchant would charge."  Section 506(a)(2) does not instruct courts to obtain

26  an appraisal of the goods in question, but instead the price it would cost to replace those goods.

27  Since 21st Mortgage's security interest is in the mobilehome itself, § 506(a)(2) instructs the court

28  to evaluate the cost of that home as what a retail merchant would get selling a mobilehome of that

1   kind; it does not instruct courts to consider any value attributed to the mobilehome's location, or

2   the likely sales price of the mobilehome if either the Hayes or 21st Mortgage sold it in place.

3       Because 21st Mortgage has not demonstrated any of its statutory rights related to the

4   mobilehome impact the value of the physical mobilehome itself, or expand its security interest to

5   include a right to the leasehold or any other right to real property, those statutory rights do not

6   impact the Court's analysis.

7                              **CONCLUSION**

8       For the reasons stated above, the order of the bankruptcy court is AFFIRMED.  As

9   explained at oral argument, this Order may seem unfair: after the Hayes pay off the box value of

10  the mobilehome—an amount far less than they originally borrowed from 21st Century to purchase

11  the home—they may be able to sell their mobilehome and the rights to the underlying lease for

12  almost ten times the cost of its box value.  But, as both sides agree, mobilehomes are unique.  The

13  mobilehome is personal property, not real property.  However, unlike almost any other item of

14  personal property, mobilehomes also possess many qualities of real property—mobilehomes often

15  remain in one place, they often gain (or lose) value based on the value of the land on which they

16  sit, and they are designed to be used as homes.  Moreover, state statutory laws provide specific

17  rules and instructions for mobilehomes' purchase, sale, and use, creating a unique regulatory

18  landscape.

19      So, any perceived unfairness resulting from this order is generated by the interaction

20  between bankruptcy laws, state mobilehome laws, and the reality that mobilehomes are *legally*

21  personal property but *function*, in many ways, as real property.  The Court does not have the

22  authority to rewrite any of the relevant laws and cannot transform the Hayes' mobilehome into

23  real property.  That is a matter for the legislators.

24      Because 21st Century's security interest extends only to the value of the physical

25  mobilehome, separate from the value of its location (or the value of the right to a rent-controlled

26  lease at that location), the proper valuation for that interest is the "box value" of the mobilehome.

27      AFFIRMED.

28

United States District Court
Northern District of California

1   **IT IS SO ORDERED.**

2   Dated: May 9, 2024

3

4

5   JACQUELINE SCOTT CORLEY
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

13