**Pages 1 - 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

| | |
|---|---|
| 21ST MORTGAGE CORPORATION,<br><br>Appellant,<br><br>VS.<br><br>MICHAEL JONATHAN HAYES, et al.,<br><br>Appellees. | **NO. 3:23-cv-04514-JSC** |

San Francisco, California
Thursday, May 2, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Appellant:

MAYNARD NEXSEN, LLP
Two Embarcadero Center, Suite 1450
San Francisco, CA 94111
**BY: SASHA G. RAO**
**ATTORNEY AT LAW**

MAYNARD NEXSEN, LLP
1901 6th Avenue North, Suite 1700
Birmingham, AL 35203
**BY: JAMES C. LESTER**
**ATTORNEY AT LAW**

For Appellees:

GOLD AND HAMMES
2570 North First Street, Suite 200
San Jose, CA 95131
**BY: JAMES GOLD**
**ATTORNEY AT LAW**

REPORTED REMOTELY BY: Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**Thursday - May 2, 2024** **10:07 a.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:** Calling civil action C-23-4514, 21st Mortgage Corporation versus Hayes, et al. If you can state your appearance.

**MS. RAO:** This is Sasha Rao for 21st Century Mortgage. I am a partner at Maynard Nexsen, in San Francisco. I'd like to introduce --

(Reporter clarification.)

**THE COURT:** That was Ms. Rao introducing Mr. Lester.

**MR. GOLD:** Your Honor, I'm having a little bit of trouble hearing. My hearing is bad, and I have one hearing aid that doesn't work.

**THE COURT:** All right. How is that?

**MR. GOLD:** Oh, wonderful. Thank you.

**THE COURT:** Go ahead and make your appearance, please.

**MR. GOLD:** Yes. James Gold appearing on behalf of the appellees, the Hayeses.

**THE COURT:** All right. Good morning.

Okay. We sort of have one interesting discrete issue, and that is with respect to the Hayeses and their Chapter 13, they wish to do a cramdown.

A very elegant term, a "cramdown."

**MR. LESTER:** Not our favorite, Your Honor.

**THE COURT:** Which --

**MR. GOLD:** It's a circle, Your Honor.

**THE COURT:** Yes. Which leaves the -- in which they are required to pay the creditor the replacement value under the Bankruptcy Code, the replacement value of the secured interest. So they can have, and do that, I mean they have an interest, part of which may be secured and part of which may be unsecured. And what we need to figure out here is what is the interest that's secured.

In the appellant's view, as I understand it, it's the mobile home in place, together with its value that it gets from the lease, the underlying lease to the property. And the Hayeses' position is it's just the mobile home and what it would cost to replace it of like kind and condition, irrespective of place.

**MR. GOLD:** Exactly.

**THE COURT:** So we start with -- so the question of what is secured is a question of California law. Is that right, Mr. Lester?

**MR. LESTER:** Yes, Your Honor.

**THE COURT:** And California says we look to the loan agreement and we see what is described. Right? And here what is described is the mobile home, and that does say located at. That's it. And, well, maybe it says some other things, too.

Attachments, accessories added to the home, as well, which aren't always secured, but in this particular loan agreement they are secured. But it doesn't say anything about the lease or the value of the lease, so how do I -- so I start -- don't I just start there, and it doesn't seem to include the value that comes from the lease.

So how do I get there?

**MR. LESTER:** Yes.

And, Your Honor, I didn't nod my head when you said the value's in the lease, because I think that's where the actual disagreement is. The value's not in the lease. The lease is valueless. The value comes from California state law and the protections it has provided to residents of mobile home parks. It also comes from rent control. The economics of this situation have been described by the United States Supreme Court, by the Ninth Circuit and by numerous federal district courts in this case.

The *Yee* decision from the United States Supreme Court I think says it very well. It says that: "Any reduction in the rent for a mobile home pad causes a corresponding increase in the value of the mobile home." So it's appellant's contention that the value is not in the lease, the value is in the home, and that's because that is what is the transferable asset. Anything --

**THE COURT:** But if, if the law did not allow or

require the mobile homeowner to transfer the lease to any purchaser, then the value wouldn't be there. So the lease is the linchpin. It's being able to transfer the lease or even require to be able to be transferred the lease that the value comes from.

**MR. LESTER:** Respectfully, Your Honor, I disagree, because the new tenant is not assigned the old lease. They're given a new lease from the manufactured home park owner that is required to give them a new lease upon meeting certain satisfactory conditions, such as the ability to pay their lease payments.

But the value itself is in the home, and the home is transferable.

**THE COURT:** Well, so the value actually comes from the state law.

**MR. LESTER:** Well, it does. And I think a good decision to understand the implications of this is the *Sunnyslope* decision, where that collateral had restrictive covenants on it that prohibited the owner of the building from receiving market rents. Basically said you have to lease 40 percent to below-market tenants. And the Ninth Circuit said, look, when we're valuing this property, the rights that are attached to that property matter, and they said that because the debtor is using that property and that property has their restrictive covenants on it, which depress its value,

that depressed value is the value for purposes of the cramdown.

Here it's just the economics are reversed. The low rent payments on the pad itself increase the value of the manufactured home, but that value is in the home. And if the debtors, if they receive the cramdown as they've requested and they pay off the $23,000 to 21st Mortgage, once the bankruptcy is discharged they'll be able to sell that home, just the home itself, for likely over $200,000. Whereas the creditor, who gave the debtors --

**THE COURT:** No, I understand that, but that's bankruptcy. So that's bankruptcy. So that's just the way it works.

So that's sort of neither here nor there.

Here's the question that I have for you, because you allude to this in your paper, as does the amicus. Sometimes where the mobile home is located can actually decrease the value of the mobile home. So, because 21st Mortgage, then, that's your position, that if the -- if the mobile home is in a location, and let's say it becomes an autonomous zone like we had in Seattle, completely lawless zone, no one wants to live there, it would actually -- the value of the mobile home went down to a dollar, that's what it would be.

**MR. LESTER:** What the appraised value of the home itself is.

I think the *Eaddy* case out of the Eastern District of

North Carolina bankruptcy court, they said that, look, the home's in rural North Carolina. And I'm from Alabama. I don't necessarily agree that it's less desirable to be in rural North Carolina.

But they said, look, it's in rural North Carolina. We're going to deduct the value by 5 percent just based on its location, being on a less desirable location.

**THE COURT:** But that's -- but 21st Mortgage in these other cases has taken a different position, that it should not be deducted because of its location.

**MR. LESTER:** I'm not sure that 21st Mortgage has ever taken that position. There has been -- 21st Mortgage has used the NADA valuation standard before in other cases, but that standard itself says that the better standard when you have available comps is an appraisal.

This home, just the home itself in 2009 appraised for $215,000. That's looking at other similar sales of just the home, and it's appraised for $215,000.

**THE COURT:** How does that appraised value equal the retail merchant sales price?

**MR. LESTER:** Your Honor, the Supreme Court in *Rash* defined replacement value -- I'm going to quote here, because I think it's important -- is the valuation that a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller. And in Footnote 2

of *Rash* they cited favorably the Ninth Circuit decision in *Taffi*, which I think is also helpful. It says: "Valuation must be accomplished within the actual situation presented. Consequently, the value has to be the fair market value of what the debtors are using."

An appraisal is seeking to ascertain fair market value.

**THE COURT:** But you're completely ignoring 506(a)(2), which is what actually the amicus really emphasizes. Surprisingly said it supported their argument. And wasn't that adopted after *Rash*?

**MR. LESTER:** It was.

**THE COURT:** Okay. So --

**MR. LESTER:** It codified *Rash*.

**THE COURT:** The final word is Congress.

**MR. LESTER:** Of course, Congress does.

**THE COURT:** So tell me, how does it square with what a retail merchant would sell it at?

**MR. LESTER:** Well, the Western District of Louisiana bankruptcy court -- now, this postdates the amendment to *Rash*. Excuse me, postdates the amendment to the Bankruptcy Code, it defined (a)(2) as the amount the mobile home would sell for in its current condition and in its current fixed location.

**THE COURT:** Okay. Tell me, how did the bankruptcy judge -- because you're actually appealing a bankruptcy, so it doesn't tell me. What I need is persuasive. What is the

reasoning that said that squares with the language of "means the price a retail merchant would charge for the property?"

How do you square it?

**MR. LESTER:** The next three words, Your Honor, "of that kind." So the bankruptcy court in the Western District of Louisiana interpreted "of that kind" to mean in its current and fixed location.

Another good example --

**THE COURT:** But how do you square a homeowner being a retail merchant?

**MR. LESTER:** There are retail merchants that sell homes in place. It can be sold back to the park, and the park would sell the home.

**THE COURT:** I don't know that that would be a retail merchant. Right? I mean, the problem is when we're dealing with a mobile home, which is considered personal property, it's like hybrid. It's also like real property. It's a home. Right? And that's sort of -- I feel like we're -- that's where the difficulty comes. If it was a car, it'd be easy.

**MR. LESTER:** Sure.

**THE COURT:** We wouldn't have this problem. What we have, it's a mobile home.

**MR. LESTER:** And respectfully, Your Honor, I think that going back to the purpose of (a)(2), of adding (a)(2) is important. *Rash* -- in Footnote 6 of *Rash*, the Supreme Court

said, look, the replacement value is going to depend on the circumstances of the property. It might be retail value, it might be wholesale value, it might be something different all together. I believe that the purpose of the amendment to (a)(2) to add that retail merchant language was to say that it shouldn't be wholesale value.

It should be more of a retail concept rather than a wholesale concept.

The Fifth Circuit in *Glenn* said that you have to read (a)(2) in conjunction with (a)(1), and so it -- what matters is the intended use of the property. And here the intended use is to keep the home. And so in the Fifth Circuit in *Glenn* they said, look, you're not going to add the cost of moving the home or the cost of delivering the home or the cost of installing the home, because those costs have already been incurred for this specific property in question.

Now, if it was truly a retail sale on a retail lot, you would absolutely have a cost for moving the home. You would absolutely have the cost for installing the home. But what the Fifth Circuit says, no, no, no, no. What we're looking at is what is the fair market value of this home where it sits today. And the fair market value of this home that the bankruptcy court was to be valuating as it sits today is in a manufactured home lot where it increases the value.

**THE COURT:** Why doesn't the loan agreement just

describe it that way, then, if that is what is secured?

**MR. LESTER:** There is nothing else to attach to, Your Honor.

**THE COURT:** Well, why not just explain what you're explaining? Why not just say that?

**MR. LESTER:** I believe it does by saying two things, the first of which is it says the home will be located in this spot, and it also says that the homeowner cannot move the home from that location without the permission of 21st Mortgage. So all that value's always going to stay there. And that's not just something that 21st Mortgage does, that's California state law says that a homeowner cannot move their home without the express permission of the lienholder. And so that value, it's there.

Everything's described, the home as it sits on the lot.

**THE COURT:** All right. Mr. Gold?

**MR. GOLD:** Your Honor, I have a number of problems with 21st's position, obviously. One of them is, first of all, there are retail mobile home lots where you can actually go and buy -- I took -- I did a Google search last night, and there's one in Chico, there's one in Santa Rosa, where you can actually go there and you can buy them --

**THE COURT:** Okay. But let's stick to the record.

**MR. GOLD:** Okay. Sorry.

**THE COURT:** Because I have to make my decision just

based on the record in front of me.

**MR. GOLD:** Absolutely, Your Honor.

The question here is if the debtor -- do you prefer debtor, or do you prefer -- I think in terms of debtor and creditor.

**THE COURT:** That's fine.

**MR. GOLD:** Okay.

**THE COURT:** I know who we're talking about.

**MR. GOLD:** Okay. That's great.

If the debtor had to go out and replace this unit, they could find one somewhere else. They don't have to find their own unit, because the security is only in, you know, what we refer to as the box, the unit itself, not with any adders for its physical location or for its -- I mean, it's ...

I'm getting tangled up here, I'm sorry.

Basically these things are, you know, sometimes they're on~-- in mobile home parks. Sometimes they're on somebody's, you know, on a relative's, you know, a relative owns a lot, say, someplace and they have this thing installed. And all the security interest is in is the box.

The fact that the state law says they can't move it doesn't affect the security interest. It doesn't -- I mean, if you had two identical units, that one of which was on the debtor's, you know, brother's property, and the other at a mobile home park, they'd be worth two completely different

amounts. And they shouldn't be worth something different in term -- it shouldn't be -- that the value of the unit does not depend on how it would be sold as a home, because they didn't -- even though it's being used as a home, pretty much it's not affected by that as such.

The debtor is actually just using it, very much like Mr. *Rash* used his truck.

This is a -- Mr. *Rash* had a commercial truck. The Supreme Court did not say because Mr. *Rash* uses this and derives any kind of economic benefit from it, therefore it is somehow worth more than what you could buy a truck for in a used truck lot.

**THE COURT:** But the question is -- I guess my question is, is there any way for a lender to secure more than the actual value of the -- just the mobile home itself? Because, of course, they did lend more than that.

**MR. GOLD:** Right, right. And --

**THE COURT:** Is it your position that it's just they're out of luck, and they could not have their secured interest as a matter of law exceed?

**MR. GOLD:** Your Honor, I really can't say whether they could have drafted -- I can think of ways in which they might have drafted their agreement so that they would have access to this incremental value that is associated with the location of the unit. Okay? I can think of a way -- whether someone who deals with real estate, you know, real property law

would say, no, Gold, you're crazy, you can't do that, you know, I think I could probably do that. I could come up with something that --

**THE COURT:** Okay. So it's not your position that they can't secure that additional interest. Just that they have not.

**MR. GOLD:** Your Honor, my argument doesn't depend on that.

Let's pretend like absolutely legally they absolutely cannot secure that part of it. Then what they're doing is they're putting a lot of money at risk on a very small security, and the small fraction of people who own mobile homes who file bankruptcy may have an advantage under the bankruptcy law that people otherwise wouldn't, but it doesn't seem to me that whether they can or cannot take a security interest in, you know, in this possessory real property interest that the -- that whoever owns the mobile home has, is really that relevant. The question is what did they take a security interest in, and they didn't.

I mean, you have ...

I mean, to me, if, if the Court were to say that the value of the mobile home box is somehow enhanced by, or that the security agreement that they entered into, you don't have to just -- you have to -- you -- to me -- I'm sort of a fundamentalist when it comes to the Bankruptcy Code in

particular. I read what it says, and I say that's what it means. And to me this is a very simple case.

On the other hand, if the Court were to say, well -- and to me, if I read the security agreement and it says these six things or these three things, whatever it is, are identified, that tells me that there's nothing else that they have a secured interest in. And if the Court is going to say, well, actually for a mobile home it's different, for a mobile home the security interest is not merely what's within the four corners of the security agreement. It also includes this extra stuff. It also includes the enhancement, because it happens to be located on, you know, near the swimming pool in the mobile home park, which increases its value more than one that's six blocks away from the swimming pool, I mean, that somehow doesn't seem -- that seems like that's a rewriting of, you know, that was not merely the Bankruptcy Code, but also state law, that, you know, that isn't right.

Now, the -- and that's not -- you know, that's, for lack of a better term, not legal. The -- I just lost my train of thought here.

**THE COURT:** Let me ask Mr. Lester something.

**MR. GOLD:** Sure.

**THE COURT:** Part of your argument is that the value, the value of location, it can't be separated from the mobile home. But that's not the case, right? If the mobile home

burned down, you could replace it. The insurance company would just give you the value of the mobile home.

**MR. LESTER:** That's not correct, Your Honor.

**THE COURT:** What?

**MR. LESTER:** Now, that's not -- this is not in the record, but it's a fair question. And the home is insured to the value of the appraisal at $215,000. So in the event that -- and there's a loss payee clause in the security agreement. And, I mean, that's just of course because the debt, the creditor's protecting itself. So in the event much a loss, a total loss, the creditor would be made whole because of the way they require the insurance to be written.

Now, Your Honor, if that is --

**THE COURT:** Because of the way they required the insurance to be written.

**MR. LESTER:** If that is an important question, I think that the order should be released, and we should any back down, and the bankruptcy court should focus on -- location can matter.

**THE COURT:** Well, location matters for value. There's no question about that. Right? There's a location that a mobile home in California, because of the statutes, is worth more than a mobile home in some other places. Right?

**MR. LESTER:** And that should end the inquiry.

**THE COURT:** No, because we know that a creditor can

have some part interest secured and some unsecured. So it doesn't end the inquiry, because the Bankruptcy Code, the bankruptcy code makes it clear that some can be secured and some unsecured. And the question is is it -- is the value so tied up in the mobile home that it's all secured, notwithstanding that the agreement itself doesn't spell that out.

Right? That's the question.

**MR. LESTER:** And I think the promise that there's nowhere else it can live. There's nowhere else that value can live except for the home itself. That's what people pay every day in California in mobile home parks. They pay that value for the home itself, because it's in the home. It's part of the home. It's like the roof of the home. It exists in the home because it can't exist anywhere else. That's the economics of the facts.

**THE COURT:** So, but is that unique for -- because a mobile home is personal property, not real property. And in terms of personal property, is that unique to mobile homes? In other words, can you think of something else?

**MR. LESTER:** Well, it all derives from rent control, and I'm not sure. I don't know the ins and outs of rent control in California, and I apologize for that, Your Honor. I don't know that in an apartment complex or in residential whether rent control would impact that disparity in value.

**THE COURT:** But that's real property. No, I meant personal property. Right? Because the problem I guess that you're running into is that it's deemed personal property, not real property, and therefore we have to stick it into 506, and 506 says you just do the -- you know, you look at what's secured.

And so what I'm wondering is can you identify any other person property that the secured interest includes this other value apart from what the actual personal property, the physical personal property itself costs.

**MR. LESTER:** I can, Your Honor. But I don't think that should be dispositive, because manufactured homes are unique. They are a hybrid existence which has caused a lot of case law and a lot of statutes. But I don't think that -- to me, the inquiry from *Rash* -- and I believe that (a)(2) codified *Rash*, so I think that *Rash* is still good law and the principles from *Rash* still govern this case. And the principles of *Rash* say what would a willing buyer pay a willing seller for this collateral. This collateral was the home, and we have legion of evidence that a willing buyer is willing to pay a lot more for this home, just this home, than in other areas of the country. Quite frankly, I'm not sure that it matters why the home is more valuable in California. The inquiry is what is a willing buyer going to pay a willing seller for this collateral.

**THE COURT:** So let's say the Hayeses bought the mobile home in Alabama, and then the lender allowed them to move it to California. Are you saying, then, that the replacement value is whatever it is now that it's in California, that's not what it was when it was purchased?

**MR. LESTER:** I think that you have to accept that.

Now, that hypothetical is not quite as easy, because there are a scarcity of mobile home pads. So I'm not sure you can just plop one down. And I don't know if the entrant into that community, how they would acquire access to put the home on there.

But yeah, I do think that that's a natural consequence of this.

**THE COURT:** So that the -- okay. Mr. Gold?

**MR. GOLD:** Your Honor, the question is not what somebody would buy this collateral for. The question is what would the debtor have to pay for a replacement for the collateral. And that is -- and I look at the security agreement and I say, well, what would it take for someone to buy a mobile home that satisfies the conditions of the security agreement in order to replace this mobile home. Because that's really what we're talking about. We're not talking about what would it cost to buy this particular mobile home right now, right where it is.

We're talking about what would it take ...

It's like if you're valuating a, you know, an automobile, it's not what would this particular automobile, what would somebody buy this particular automobile for. It's what would the debtor have to pay in order to replace this automobile with an equivalent, something that is, you know, within the scope of the legal description in the code, and *Rash* and all the other decisions, the equivalent. We're not talking about trying to sell this mobile home, what the debtor would cost to be -- you know, if the debtor is walking in off the street and had a bunch of money in his pocket, what would it cost for him to buy this particular mobile home. The question is: What would it cost to replace the collateral. Because that's what really we're talking about.

The only collateral was the box itself.

Now, in terms of insurance, I'm surprised that they have the thing insured for more than the value of, you know, the replacement value for the unit. I didn't understand why the real property interest is being, you know, is subject to the insurance. If you could take and put another mobile home -- you know, let's say it did burn down. Why should the insurance company pay -- my guess is the insurance company would. They would just pay for the replacement value for the mobile home. The upper limit may be the purchase price, but it's not like the real estate's going to be destroyed.

The -- you know, the insurance on a real property, a real

house, the insurance is on the structure, it's not on the land. The land is going to be there no matter what. If the place burns down, the land will still be there. The adder for the land, maybe they -- you know, maybe they need to get some cheaper insurance, I don't know.

The replacement is replacement for property of that kind. This is the kind of words that are used. It doesn't mean that you have to take and somehow replicate -- this isn't like Star Trek, where you can take a piece of equipment and put it into a machine and have the thing buzz and make sparkly lights, and now you got two machines exactly identical. Okay. You don't have to replace this unit with an identical unit. We have to replace one with one that's sufficiently equivalent so that you can figure out what the value is.

And that's contained within the security agreement, and that's all they have a security interest in is what's in their security agreement.

Now, in terms of earlier there was a -- the comment about the *Eaddy* case, if I remember correctly, the Court there -- not that it's precedential, obviously. There are very few cases that are precedential for this Court. But in the *Eaddy* case, I believe the value was lower because the property, as I understand it, was in subpar condition and needed repairs, and the distance to get the right kind of workmen out to where the place, where the unit was, would, in the mind of the judge, at

least justify decreasing the value, because it would cost more to repair it than the difference in condition would indicate in the ...

But whatever, that's a separate thing.

The idea that the use of a mobile home is something that, as I say, I think I mentioned that before with *Rash* and his truck, the fact it's used for income or the fact the debtor is using this as their home, really, I mean, the way I read *Rash*, it's a binary kind of decision. You're either using it or dismiss posing of it. In this case the debtors are using it, and the fact they're using it for a home or the fact that they're using it where it presently is really has no effect on what the secured value is.

**THE COURT:** One thing. I was thinking of this retail merchant thing. Right? So you knew if you sell your mobile home you have to pay use tax, but that use tax as I understand it is based on just the mobile home and not the additional value that you get from those statutory protections, which I think sort of then lends or works against the argument that somehow that value isn't separate from the actual value itself. There's no question that they lent money based on that value. Right? There isn't any question about that. The question is what did they actually secure, what did they secure, not what's owed, what did they secure. But that's really, that's why I started at the beginning as to what was described.

And so then you go to this argument, well, you can't separate it. But you can separate it. I mean, it is separated. It's separated in that instance. I think it is separated in the sense that you can -- it may not happen much, but you -- it can burn down, and it can be replaced, just the mobile home itself.

**MR. LESTER:** If I may, Your Honor?

**THE COURT:** Yes.

**MR. LESTER:** I think *Sunnyslope* is a good case to review in this circumstance, because what *Sunnyslope* said is you're looking at the collateral, this collateral, and I believe the words are "worts and all." Now, in that case there were worts because there were the restrictive covenants that depressed the value. In this case, there are aspects of where the home sits that increase the value of the home. But the inquiry is you have to take it all together, and that's what you have to value.

And I really do believe that questions of insurance -- I think that there are a lot of indications of value, one of which is location. The bankruptcy court erred because --

**THE COURT:** That's true. But, I mean, we're talking about personal property, and I think maybe the key was you said this is hybrid. And, in fact, maybe we're trying to stick a square peg into a round hole, and maybe that's the problem. And maybe the answer is you have to go to Congress, because

it -- because as long as we're calling a mobile home personal property, it's personal property, and we have to treat it as we do personal property, as opposed to -- I mean, there's all sorts of things, right, depending on where it's located. You may sell your car -- you're not from here, so if I give you a local place, but in an affluent neighborhood, and you're going to be able to get a higher price than if you sell it in a not-so-nice neighborhood. Exact came car. Right? But because certain people aren't going to be willing to come to that other neighborhood to buy. But we don't say that impacts the value. We wouldn't say that that would impact the value of the car, we would just look to Kelley Blue Book, right, regardless of location.

**MR. LESTER:** I think that to use a car example. But if there was a new engine in the car, we would absolutely value it more. Same car, new engine. And that -- there was a case --

**THE COURT:** Yeah, yeah. But your agreement says that it includes all that stuff. So your loan agreement includes that expressly in there. It includes that, so that's different.

But you're really talking about a change in value because of location, and what I'm trying to find is some analogy for personal property that we would actually look at that. And of course there's all sorts of nuances that go into value when you

do that, like I said with respect to the car, where you sell it, depending on where. Or the state that you sell it in would even affect value, because gas prices in California are so high compared to Alabama.

**MR. LESTER:** But even NADA accounts for that. So even NADA has a -- it's -- you know, if you bought it in Alabama, it might depress the price by 1 percent. If you buy it in California, it might increase the price by 7 percent. So this concept of location can add value is not unique. NADA itself accepts that. And what we're just saying is here this location is really valuable, and that value goes into the home, because that's what a willing buyer and a willing payer, a willing seller are willing to transact for it. And I believe that that is the intent of *Rash*, and I believe that the Bankruptcy Code codified *Rash*.

And then to be faithful to *Rash*, you have to look at what could the debtor sell this home for today. What could they sell it for? Just the home. That is what *Rash* asks.

**THE COURT:** Today what could they sell it for.

**MR. LESTER:** Well, the bankruptcy court won't let us answer that question. That's why we believe the order should be reversed, and let's ask that question. Let's get an appraisal of the home only and see what an appraiser says they can sell the home-only for. The bankruptcy court erred because they took that tool out of our toolbox. They said --

**THE COURT:** Well, because it's your position that it's the -- that that's what's secured is the value of the mobile home in that particular mobile home park. That is what is secured, not just the mobile home itself.

**MR. LESTER:** Because that is the actual use of the collateral that the debtors will retain.

**THE COURT:** And because state law requires that it stay there.

**MR. LESTER:** Correct.

**MR. GOLD:** But, Your Honor, I have one comment that I actually have to make.

*Rash* did not say that Mr. *Rash*'s truck was worth what he could sell it for. Absolutely not. They didn't say what -- the Bankruptcy Code does not contemplate, for the purposes of cramdown, what a debtor could sell the collateral for or the security for. It is what it would cost the debtor to replace it in a commercially, you know, commercially reasonable kind of way, like going to a mobile home lot in, as I said, Santa Rosa or Chico, and, you know, and buying one. And in other parts of the country -- I'm sure they have more of them than California. They don't have -- whatever.

Anyhow, but *Rash* actually did not say anything about debtor selling his truck. If he had, then *Rash* would be talking in terms of the disposal, not the use. They would be talking about the disposition.

**THE COURT:** They would be talking about a foreclosure situation.

**MR. GOLD:** I'm sorry?

**THE COURT:** A foreclosure situation. Right? Which is what *Sunnyslope* says we don't look at. I mean, right? That's part of --

**MR. GOLD:** No, and -- sorry.

**THE COURT:** In your argument they meet. You're essentially arguing that the value is the same as if the lender could foreclose, which the cramdown is stopping.

**MR. LESTER:** I don't think that's true.

I mean, I think a foreclosure is a pretty quick process. It's -- you might not be able to extract maximum value in a foreclosure than you could in an arm's length transaction. But this is the language from *Rash*: "Willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller."

I just disagree with my friend on the other side that that's not asking for a fair market consideration of this collateral.

**THE COURT:** But why didn't Congress --

**MR. GOLD:** That's correct.

**THE COURT:** -- then, when they amended 506 say that? What they said is: "Replacement value shall mean the price a retail merchant would charge for property of that kind," not a

willing buyer would pay for property of that kind.

**MR. LESTER:** I believe that is a protection for creditors. That it is -- it is to say that we -- the debtor itself may not be able to put it on the open market, like a Zillow. Right? But it is a protection for creditors that they basically get the benefit of an arm's length transaction.

**THE COURT:** Well, it didn't -- they could have said whatever gets you the higher value. Didn't say that, right? But I'm left with the -- I'm left with how do I say your argument, a willing buyer is a retail merchant? I mean, a retail merchant has to have some meaning.

**MR. LESTER:** It absolutely --

**THE COURT:** They could just say buyer. They didn't say buyer. They said a retail merchant.

**MR. LESTER:** And I believe, again, that that is to protect -- that is --

**THE COURT:** That may have been the intent, but you know, I'm sure you're well aware, the Supreme Court and how I interpret laws. Right? And I can't go behind the plain meaning. So I'm just trying to figure out how I fit a willing buyer, a consumer, intending to use for personal, family or household purposes, that that becomes -- looking at what that person would pay becomes -- or how the Hayeses essentially become a retail merchant.

**MR. LESTER:** So I believe that -- and this is coming

from *Glenn* and it's coming from *Allen* that are cited in our papers, that (a)(2) does not exist independently of (a)(1); they have to be read together. And (a)(1) talks about the proposed disposition or use of such property. And again, that's the -- that language I don't believe was amended. That's the language that *Rash* was interpreting.

**THE COURT:** But that's still there, but we still have retail merchant. It's still there. Right?

**MR. LESTER:** Right. And, yes, Your Honor. I'm getting to that. That it is retail merchant would charge for property of that kind. And again, if the question is are there retail merchants that can sell these homes for the full value that we're advocating, then this case needs to go back to the bankruptcy court decision to make that determination.

I believe that there are facts that would show that there are retail merchants that can sell these homes for what we believe is the appropriate valuation. I don't believe that --

**THE COURT:** Let me ask you something. Doesn't the value of a mobile home, when you resell it, include the value that the original purchaser paid for the setup and delivery costs?

That's baked into that value, isn't it?

**MR. LESTER:** That was the holding in *Glenn*, I believe.

**THE COURT:** Right. But *Glenn* we know that those are

excluded. So do I take that fair market value that you're talking about and now take out those other things? How do I do that?

**MR. LESTER:** Not sure I'm tracking you, Your Honor.

**THE COURT:** Well, the price that a buyer will pay for the Hayes' mobile home includes the fact that they don't have to pay that delivery and setup cost. So it's baked into what that fair market value is.

**MR. LESTER:** I think what *Glenn* said is that those are listed separately.

**THE COURT:** Well, whether they're listed or not, what I'm saying is it's in there, isn't it? That value, that -- in other words -- this is why it becomes very complicated. How do I separate that value from those statutes, as opposed to the value from, I don't know, the school district, or the value from it's a good police department, or the value from I don't have to set it up?

**MR. LESTER:** No, I'm with you, Your Honor.

In *Glenn*, the creditor, and it was 21st Mortgage, but the creditor was trying to tack on costs to the appraisal value. And so it was -- so what *Glenn* recognized, it said, look, no, no, no. Let's see what the home itself is worth, but we're not going to add stuff on. And so that's why we believe *Glenn* supports us in this case is because all we're asking to do is consistent with *Glenn* is to just see what the home's worth, but

not allow for certain value to be -- that's in the home to be removed from an appraisal.

**THE COURT:** I see.

Okay. So *Glenn* -- okay.

**MR. LESTER:** I apologize.

**THE COURT:** Mr. Gold?

**MR. GOLD:** Your Honor, *Glenn* is really a pretty trivial case. 21st Mortgage in *Glenn* didn't have a security interest in the, you know, the moving and setup charges. That wasn't part of it. And just our initial case, what's left of it, says basically that something has to be in the security agreement in order to be able to, you know, to have it add value to the security.

That's -- I mean, in that case --

**THE COURT:** That's -- no, I know. But that's the question.

**MR. GOLD:** Well, so the question --

**THE COURT:** That's the question. What does the security agreement securing the mobile home, secure the mobile home in place given that the Hayeses cannot move it without the lender's permission?

**MR. GOLD:** Your Honor, the Hayeses don't have to move it. They don't have to sell it. They can replace it. What does it cost for them to find something that's equivalent that it would be a replacement for the collateral? That's what

the -- that's what the code says. That's what the Bankruptcy Code says. That's what the Supreme Court said in *Rash* and so on, is what would it cost to replace this security. It's not what extra real unique characteristics does this security have. The security might be right across the street from Disneyland. It isn't, but if it were, it would be worth a tremendous amount of money. But not because this, you know, 20-some-odd-thousand-dollar box was all that they have a security interest in.

We're not talking about -- they're talking about taking and saying you can't separate the mobile home from its location, and therefore their security interest is extended beyond the mobile home to other things. And what it is you have to do is if you say, yeah, they're right, it is more than just the box, it's more than just what's in the security agreement, it is these other things, you have to be able to say what these other things are and what legal authority you can point to, whether it's statutory or whether it's case law, that says, yeah, this is part of the mobile home, enough so that this becomes part of the security agreement or supersedes the security agreement or something. And if you do that, then not only are you throwing a monkey wrench into the bankruptcy system for this special case -- and mobile homes are a special case, and they need to go to Congress.

I asked counsel, in talking on the phone, where were you

when we needed to have somebody write an amicus brief for Mr. Rash. Okay? The mobile home people could have come in and said, well, actually things are more complicated. It shouldn't -- it should be the liquidation value, not the replacement value. But that's what *Rash* said. No, it's not liquidation, it's replacement.

And now we have replacement, and replacement is real good for car lenders, and it's real bad for mobile home lenders, and I have a lot of sympathy for them. Our first -- when we had the Mitchell case, the question before the Court then was, should -- is it fairer and consistent with the bankruptcy system to have the secured claim value be what the creditor would get if, instead of getting an income stream on a secured claim, if the debtor had just, at the time of filing or time of confirmation just said, here, take my car. And the reason for that was that GMAC had a totally different way of liquidating repossessed cars from other places.

A credit union, say, would put it on the lot behind the credit union. People would come by, and if they got a good enough price, they would sell it. GMAC wholesales these cars out, and they get between one-third and two-thirds low Blue Book for these cars, and then they come after people for the deficiency.

My thought was we could reformed GMAC's system by giving them only what they would get if they got the car. And, you

know, maybe they would then have a more efficient way, a more practical way of selling these things. Okay? So they'd get a higher value for it, and therefore the people whose cars they had repossessed would have a lower deficiency on their loan, or maybe they would get enough to pay off the loan. But, and that worked at the Ninth Circuit. Okay. That worked at -- that worked at the BAP, that worked for the Ninth Circuit. That was the argument that was used, one of the arguments that was used on *Rash*, when we took *Rash*, which, where the three-judge panel said that it was -- that it was replacement value, and that got turned around.

My partner, Norma Hammes, stood in front of 14 judges at the Fifth Circuit en banc and argued for Mr. Rash on behalf of the National Association of Consumer Bankruptcy Attorneys, and the Fifth Circuit reversed as a panel. It went up to the Supreme Court, and the Supreme Court said, no, it's replacement value. It's replacement value for the security.

What's the security here? The box. Nothing more. Just the box. Not the place that it happens to be in. It's not what it would cost for some, you know, what -- you know, it's not what Mr. Rash would get if he sold his truck, it's what he would have to pay to replace that truck. And that's all we're saying here.

It's a bad situation for 21st Mortgage, no question about it. But the law is the law, and, you know, I -- as I say, I

have sympathy for them, because I really wish that the Supreme Court in *Rash* had gone the other way, in which case they would have their full in-place value, because that's how they would liquidate a mobile home if they got -- if it were handed to them on the day that ... but, you know, there are winners and losers.

A lot of people in the Ninth Circuit won when we won Mitchell, and a lot of people across the country who filed bankruptcy lost when Mitchell was reversed by, you know, by *Rash* at the Supreme Court. And these things happen, and the fact that we're taking -- maybe I shouldn't say taking. I was going to say taking advantage of. The fact that we're using --

**THE COURT:** That's what they think.

**MR. GOLD:** Yeah, he'd agree. I'm sure he'll agree with that.

The fact that we're using the Bankruptcy Code to cram down, meaning like take the car and cram it down the lender's throat, to cram down the mobile home, is, from their perspective, certainly financially undesirable. But they have a lot of loans, and very few people actually file bankruptcy and do this kind of thing. So it's not that much of an impact.

Anyhow ...

**THE COURT:** Okay. And that was the result in *In Re Young*, so it's not the first time that it's happened. I note the judge there said in the opinion that -- was that also 21st

Mortgage?

**MR. LESTER:** I'm sorry, I lost the sentence. What case are we talking about?

**THE COURT:** Oh, *In Re Young* --

**MR. LESTER:** Yes. I don't believe it was.

**THE COURT:** -- that bankruptcy court from our district, which did hold that it was just the replacement value, not in-place value. The judge there said that the form was drafted to permit creditor to take a security interest in the mobile home park, Tennessee if desired. But I actually went back and looked at that docket, and I think it was the same as here, which was you can just do a deed or the mortgage, and I actually just think that's incorrect. I don't --

**MR. GOLD:** It is actually. Judge Weisburg got -- I think got that wrong.

There's a provision in there that says, in the standard agreement that says that if, if they have a mortgage, then the security includes the mortgage or deed of trust. But if they don't, they don't, and --

**THE COURT:** Right. And there is no deed of trust here --

(Simultaneous crosstalk.)

**THE COURT:** So I think that statement in *In Re Young* was incorrect, but that was sort of why I was asking.

All right. Mr. Lester, you're the appellate. I'll let

you have the last word.

**MR. LESTER:** Well, I was going to end with just answering the question of where I was during *Rash*, which is in elementary school. So I wasn't able to draft an amicus brief, although I would have probably liked to.

No. In all seriousness, I mean, this is a big deal for our industry, of course, as I'm sure the Court is well aware. But I do think we need to go back to *Rash*, because I believe that *Rash*, we have to focus on what it is, what was the underlying reasoning of that decision. And what they said is that -- what the Supreme Court said is that, look, there is no foreclosure. The debtor gets to keep the property. And because the debtor gets to keep the property, we have to look at what the debtor's going to use the property for.

Now, that reasoning I don't believe has been abrogated by use of the word "retail merchant" or by any language in (a)(2). It's what is the debtor going to use the property for. Here, the debtor is going to use the personal property as a home as it sits in the park, and any value that that home gets from that use should be part of a valuation at cramdown.

Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

It's very interesting. I learned a lot in this appeal. Thank you for coming in.

**MR. LESTER:** Thank you, Your Honor.

**MR. GOLD:** Thank you.

(Proceedings concluded at 11:00 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, June 25, 2024



Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court